# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DION WINSTON,

    Petitioner,

vs.

DWIGHT NEVEN, et al.,

    Respondents.

Case No. 2:09-CV-00393-JCM-(RJJ)

**ORDER**

Before the court are the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (#5) and respondents' answer (#10). The court finds that relief is not warranted, and the court denies the petition.

After a jury trial in the Eighth Judicial District Court of the State of Nevada, petitioner was convicted of three counts of attempted murder with the use of a deadly weapon and one count of discharging a firearm into a structure, vehicle, aircraft, or watercraft. Ex. 13 (#10). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 18 (#10).

Petitioner then filed in the state district court a post-conviction petition for a writ of habeas corpus. Ex. 22 (#10). The district court denied the petition. Ex. 24 (#10). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 26 (#10).

Petitioner then commenced this action. Pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, this court dismissed three grounds of the petition. Order (#4). Ground 1 was a claim that counsel provided ineffective assistance because he did not request an instruction on a lesser-included offense of aiding and abetting attempted murder. The

1  court dismissed this ground because in Nevada aiding and abetting is not a lesser-included offense,
2  but carries the same penalty as the person who actually committed the criminal acts.  Ground 3 was
3  a claim that imposition of equal and consecutive terms of imprisonment for the use of a deadly
4  weapon on top of the terms of imprisonment for attempted murder violated the Double Jeopardy
5  Clause of the Fifth Amendment.  The court dismissed this ground because well-established case law
6  has determined that such sentence enhancements do not violate the Double Jeopardy Clause.
7  Ground 4 was a claim counsel provided ineffective assistance because he did not request
8  instructions that defined express malice and implied malice.  The court dismissed this ground
9  because only express malice can establish attempted murder and because the jury instruction on
10 attempted murder defined express malice.  Reasonable jurists would not find these conclusions to be
11 debatable or wrong, and the court will not issue a certificate of appealability on them.

12         Ground 2 is the remaining claim of relief, and petitioner litigated it in the state courts.  "A
13 federal court may grant a state habeas petitioner relief for a claim that was adjudicated on the merits
14 in state court only if that adjudication 'resulted in a decision that was contrary to, or involved an
15 unreasonable application of, clearly established Federal law, as determined by the Supreme Court of
16 the United States,'" Mitchell v. Esparza, 540 U.S. 12, 15 (2003) (quoting 28 U.S.C. § 2254(d)(1)),
17 or if the state-court adjudication "resulted in a decision that was based on an unreasonable
18 determination of the facts in light of the evidence presented in the State court proceeding," 28
19 U.S.C. § 2254(d)(2).

> A state court's decision is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court's decision is not "contrary to . . . clearly established Federal law" simply because the court did not cite our opinions.  We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

Id. at 15-16.  "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotations omitted).

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

In ground 2, petitioner claims that his counsel was ineffective for failing to investigate Robert LaBelle, because LaBelle testified at trial that he was not shot by petitioner. "[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 & n.14 (1970). A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Strickland expressly declines to articulate specific guidelines for attorney performance beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution. 466 U.S. at 688. The Court avoided defining defense counsel's duties so exhaustively as to give rise to a "checklist for judicial evaluation of attorney performance. . . . Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Id. at 688-89.

Review of an attorney's performance must be "highly deferential," and must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." Strickland, 466 U.S. at 689. A reviewing court must "indulge a strong presumption that counsel's

1  conduct falls within the wide range of reasonable professional assistance; that is, the defendant must
2  overcome the presumption that, under the circumstances, the challenged action 'might be considered
3  sound trial strategy.'" Id. (citation omitted).
4      The Sixth Amendment does not guarantee effective counsel per se, but rather a fair
5  proceeding with a reliable outcome. See Strickland, 466 U.S. at 691-92. See also Jennings v.
6  Woodford, 290 F.3d 1006, 1012 (9th Cir. 2002). Consequently, a demonstration that counsel fell
7  below an objective standard of reasonableness alone is insufficient to warrant a finding of
8  ineffective assistance. The petitioner must also show that the attorney's sub-par performance
9  prejudiced the defense. Strickland, 466 U.S. at 691-92. There must be a reasonable probability that,
10 but for the attorney's challenged conduct, the result of the proceeding in question would have been
11 different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence
12 in the outcome." Id.
13     If a state court applies the principles of Strickland to a claim of ineffective assistance of
14 counsel in a proceeding before that court, the petitioner must show that the state court applied
15 Strickland in an objectively unreasonable manner to gain federal habeas corpus relief. Woodford v.
16 Visciotti, 537 U.S. 19, 25 (2002) (per curiam).
17     Petitioner was accused of shooting at Clifton Newman, Jovan Young, and Robert LaBelle.
18 Though Newman and Young were not hit, LaBelle was struck and paralyzed. Up to the instant of
19 the shooting, the evidence was largely consistent. Petitioner offered to sell a radio to Newman and
20 his girlfriend, Tamika Brown. Newman and Brown were residents in the Hampton Court
21 apartments in Henderson, Nevada, and petitioner resided with his father to the east in the
22 neighboring Paseo del Prado apartments. Petitioner and Newman agreed on a price of $25.
23 Newman gave petitioner $20 and promised to pay the balance after Brown went to a store and
24 cashed a check. Ex. 9, pp. 34-35, 78 (#10). Payment of the balance did not occur as quickly as
25 petitioner would have liked, and petitioner, or a person acting on petitioner's behalf, went to the
26 apartment several times after the sale asking for the remaining $5. Eventually, petitioner and
27 Newman got into a fistfight. Id., pp. 83. Newman and Jovan Young, who was present in Newman's
28 apartment and who also resided at the Hampton Court, chased petitioner off toward some houses

1  across the street from the apartments.  Id., pp. 83-84, 112-14.  A short time later, a resident of the
2  same building in which Newman and Brown lived saw petitioner and one unknown person jump
3  over a wall from the Paseo del Prado apartments into the Hampton Court apartments, and then pull
4  out guns.  Id., pp. 55-58.  Another witness saw petitioner and two unknown people jump over the
5  wall and pull out what she thought were guns, but she was not certain.  Id., p. 135.  Meanwhile,
6  Newman was sitting in a chair on a balcony outside his apartment, and Young, LaBelle, and a
7  neighbor named Dwight Rogers were walking on the balcony toward stairs that led to the ground.
8  Id., pp. 91, 116-17.  Gunfire erupted, and LaBelle was hit in the back.  Bullets hit the outside wall of
9  Newman's apartment and the metal rails of the balcony.  Id., pp. 93, 121.  Petitioner and his
10 unknown accomplice or accomplices left the area.  Newman and Young, who had their own reasons
11 why they did not want to encountering the police, also left.  Id., p. 122.

12       Police responded and investigated the scene.  At the base of a tree near the wall between the
13 two apartment complexes, an officer and an investigator found spent casings, both .45 and 9mm
14 caliber, on the ground.  Ex. 9, p. 159; Ex. 10, pp. 11-12, 88 (#10).  The investigator also found that
15 bullets had struck the railing of the balcony and had gone through the walls of Newman's apartment.
16 Ex. 10, pp. 19-20 (#10).  A detective located petitioner in his mother's house, and he found with
17 petitioner .45 caliber cartridges of the same manufacture as those that were found on the ground at
18 Hampton Court.  Ex. 9, pp. 170-72 (#10).

19       The trial testimony revealed an inconsistency as to who did the shooting.  The witnesses who
20 saw petitioner and the others jump over the wall and produce weapons heard shots, but they did not
21 see who was shooting because they were running to protect children who were playing outside.  Ex.
22 9, pp. 59, 135 (#10).  Newman heard petitioner say, "There they go right there," heard noises like
23 firecrackers, and realized that shots were being fired when he saw Young running and bullets
24 striking his apartment's exterior.  Id., pp. 91-93.  Young heard guns being cocked, and he heard
25 somebody say something along the lines of "There they go right there," though he admitted later the
26 comment was more colorful than that.  Young peeked around a corner, at which point he heard guns
27 being fired and he ran for cover.  Id., pp. 117-19, 126-27.  Nobody saw LaBelle get shot.
28

1  LaBelle's testimony was different. He testified that there was only one shooter, and that the
2 shots came from the person in the chair. Ex. 10, pp. 38-41 (#10). That person would have been
3 Newman, according to Newman's and Young's testimony.

4  Petitioner claims that counsel should have investigated LaBelle before trial. He argues that
5 counsel would have found that the bullet that struck LaBelle was a different caliber than the bullets
6 fired from the ground, and thus petitioner would have been innocent of attempted murder of
7 LaBelle.

8  Petitioner raised this issue in his state post-conviction proceedings. On this issue, the
9 Nevada Supreme Court held:

> Second, appellant claimed that his trial counsel was ineffective for failing to investigate whether Robert Labelle was shot by one of the other victims. Appellant noted that Labelle testified that he was shot by someone on the balcony, and appellant claimed that his trial counsel should have investigated Labelle's injuries and medical records and interviewed Labelle. Appellant claimed that such an investigation would have led trial counsel to discover that the caliber of weapon alleged to have been used by appellant was different from the caliber of the bullet that lodged in Labelle's back. Appellant failed to demonstrate that there was a reasonable probability of a different outcome had further investigation been conducted. The bullet was still lodged in Labelle's back at the time of trial, and thus, appellant failed to demonstrate that his trial counsel would have been able to ascertain the caliber of the bullet that Labelle was shot with. The testimony at trial indicated that appellant was with at least one other person at the time of the shooting, and one witness testified that she saw both appellant and the second person pull guns out of their waist bands after jumping over the wall. Thus, testimony regarding a different caliber weapon would not have had a reasonable probability of altering the outcome of the trial given the State's theory that appellant was liable as the shooter or for aiding and abetting the shooter. Trial counsel referenced Labelle's testimony during closing arguments, however, the jury convicted appellant of the attempted murder of Labelle. It was for the jury to determine the weight and credibility of the testimony and evidence. Therefore, we conclude that the district court did not err in denying this claim.

21 Ex. 26, pp. 3-4 (#10).

22  Because petitioner argues that counsel should have investigated LaBelle before the trial, the
23 court must examine counsel's options from counsel's perspective at that time. Strickland, 466 U.S.
24 at 689. Examining the bullet that struck LaBelle was not an option, because that bullet was still
25 inside LaBelle. Petitioner did not have the money to pay for surgery to remove that bullet, and the
26 Constitution does not require a defense counsel to pay for surgery as part of his representation of a
27 client. Moreover, no evidence has ever been developed that it was possible to remove the bullet
28 without risking more serious harm to LaBelle.

The question then becomes whether counsel reasonably should have learned LaBelle's version of events before the trial started. LaBelle's testimony apparently came as a surprise. In his closing argument, the prosecutor stated, "And, truthfully, the only wrench that's been thrown into the State's case at all was the testimony of Bob LaBelle, because Bob LaBelle said that the guy sitting in the chair was the one shooting at him." Ex. 10, p. 113 (#10). If the prosecutor knew what LaBelle's testimony would have been, then the prosecutor would have taken that into account in his opening statement and perhaps in the witnesses that he called. At the preliminary hearing, the prosecution presented a witness named Nicholas Brown. Brown testified that he observed the scene from the Paseo del Prado apartments, and he saw two men by the tree firing up toward Newman's and Brown's apartments. Ex. 3, pp. 23-24 (#10). Although the prosecution did not call Brown to testify at trial, petitioner's counsel heard Brown's testimony at the preliminary hearing, and that testimony was consistent with everyone else's statements about the shooting. Nothing in the record up to the trial would have given counsel reason to think that LaBelle's testimony would be inconsistent with the testimonies of the other witnesses.

Even if counsel did investigate LaBelle before trial, counsel would have found at best that LaBelle was very confused. LaBelle's statement about who shot him cannot be taken in isolation. LaBelle's other statements were contradicted not only by the other eyewitnesses, but also by the physical evidence. Not only did LaBelle testify that the gunshots came from the person in the chair, who could only have been Newman, LaBelle also testified that there was only one shooter, namely, Newman. The evidence showed that bullets struck the exterior wall of Newman's and Brown's apartment, with some bullets passing straight through and exiting the apartment through another wall. Newman's and Brown's two children were inside the apartment at the time. LaBelle's testimony would require the jury to believe that Newman reached from where he was sitting and shot into his own apartment, thus endangering his own children. Furthermore, the evidence showed that bullets struck the metal railing of the balcony and ricocheted off. LaBelle's testimony would require the jury to believe that Newman reached around the railing and shot into it, thus risking his own life by any ricocheting bullets. Finally, the evidence showed that spent casings of two different calibers were found downstairs at the base of a tree near the wall that separated the two apartment

complexes. LaBelle's testimony would have required the jury to believe that Newman was using two pistols and that somebody other than Newman—because he fled the scene right after the shooting—then scooped up the spent casings and distributed them near the tree.

Nonetheless, petitioner's counsel took advantage of the opportunity that LaBelle's testimony gave him. Earlier in the trial, Young testified that he was armed at the time that he and Newman chased petitioner away. Both Young and Newman testified that they were in trouble with the law. With LaBelle's testimony that a person who could only have been Newman shot him, counsel argued to the jury that petitioner could not have been guilty of attempted murder of LaBelle. Ex. 10, pp. 120-21 (#10). Counsel quickly developed a new theory of defense based upon that inconsistent testimony. Although the jury found petitioner guilty of attempted murder of LaBelle with the use of a deadly weapon, counsel did not perform deficiently.

Reasonable jurists might debate over the court's resolution of ground 2, and the court will grant a certificate of appealability on the issue.

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus (#5) is **DENIED**. The clerk of the court shall enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is **GRANTED** on the issue whether trial counsel was ineffective for not investigating the victim Robert LaBelle before trial to determine whether petitioner or his accomplices actually shot LaBelle.

DATED February 6, 2012.

JAMES C. MAHAN
United States District Judge